**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

|  |  |
|---|---|
| **ANDREW CHAMBERS**, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>*v.*<br><br>**SHINE, INC.**, a Delaware corporation,<br><br>*Defendant.* | CASE NO. 6:17-CV-1449 |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS AND TO COMPEL ARBITRATION
OR, IN THE ALTERNATIVE, TO TRANSFER VENUE**

## I.      INTRODUCTION

This case challenges Defendant Shine, Inc.'s ("Defendant" or "Shine") serial violations

of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA"). In short,

Chambers alleges that Shine sends unsolicited text messages to consumers who never signed up

to receive its messages.

In an effort to deny Plaintiff Andrew Chambers ("Plaintiff" or "Chambers") his day in

court, Defendant has moved to dismiss the case and compel arbitration pursuant to the Terms of

Service found on its website. (Def. Mot. at 9-15.) However, the problem for Shine is that

Chambers denies ever visiting its website and agreeing to the Terms. Moreover, Shine doesn't

present any compelling evidence that he did. Thus, since Chambers never visited the website he

likewise could not have agreed to Shine's Terms of Service, including the arbitration clause

contained in the Terms.

Furthermore, assuming *arguendo* that Chambers did visit the website, Shine's arbitration

agreement contained in the Terms of Service is unenforceable for two reasons: (1) the Terms of Service constitute an unenforceable browse-wrap agreement; and (2) the arbitration clause is both procedurally and substantively unconscionable. Accordingly, Defendant's Motion should be denied.

Shine also moves in the alternative to transfer the case to the Eastern District of New York by attempting to invoke a forum selection clause buried in its Terms of Service. (Def. Mot. at 15-20.) However, as stated above, the Terms of Service are not enforceable against Plaintiff because he never agreed to them. Furthermore, similar to the arbitration provision, Shine's forum selection clause is part of an unenforceable browse wrap agreement. Hence, no valid forum selection clause exists to be enforced.

Finally, Shine argues that in the alternative the Court should transfer the case to the Eastern District of New York on forum non conveniens grounds. (Def. Mot. at 21-22.) This is unnecessary. First, Chambers is entitled to deference to his chosen forum. Second, a substantial portion of the evidence necessary for this case resides in Florida (*i.e.*, cell phone, computer, and cellular providers). Third, Shine has not shown any way in which it will be prejudiced by being required to litigate in Florida. Consequently, the Court should deny Shine's forum non conveniens argument.

Accordingly, and as explained in detail below, the Court should deny Defendant's Motion in its entirety.

## II.    STATEMENT OF FACTS

Shine is a communications business based in Brooklyn, New York. (Compl. ¶ 13.) Shine's business involves sending text messages that are intended to inspire and motivate the recipients of said messages. (Compl. ¶ 1.) Plaintiff Chambers is a natural person and resident of

2

Orlando, Florida. (*See* Declaration of Andrew Chambers ("Chambers Decl.") ¶ 1, attached hereto as Ex. A.)

Beginning in or around March 2017, Plaintiff began receiving unsolicited text messages from Shine. (Chambers Decl. ¶ 2.) Plaintiff received the messages on his cellular telephone, which is an AT&T pre-paid cellular telephone. (*Id.* ¶ 4.) Between March 31, 2017 to April 29, 2017, Plaintiff received approximately twenty-five text messages from Shine. (Compl. ¶ 27.) Plaintiff attempted to send three opt-out requests to Shine; while one failed to send, two attempted opt-out requests were successful on the following days: April 14, 2017 and April 17, 2017. (Chambers Decl. ¶ 6.) Unfortunately, Shine refused to cease sending text messages. (*Id.* ¶ 5.) Plaintiff continued receiving text messages on nearly a daily basis from Shine until he filed this Complaint. (*Id.* ¶ 2.) Since Chambers utilizes AT&T's pre-paid service, each and every text message caused him to incur a charge of $0.20 to his month bill. (*Id.* ¶ 4.)

Plaintiff has never consented to receive any calls from Shine. (Chambers Decl. ¶ 7.) In fact, prior to initializing the current litigation, Plaintiff did not even know what Shine's business entailed. (*Id.*) Further, Plaintiff never visited Shine's website (shinetext.com) and his IP address (162.230.109.238) does not match the IP address provided by Shine. (*Id.* ¶ 8.) As a result, Plaintiff has never had the opportunity to review, let alone agree to, Shine's terms and conditions; including its arbitration and forum selection clauses. (*Id.* ¶ 7.)

## III.   ARGUMENT

The FAA requires district courts to stay judicial proceedings and compel arbitration of claims only where they are covered by a written and enforceable arbitration agreement. *James v. Glob. TelLink Corp*, 852 F.3d 262, 265 (3d Cir. 2017) (citing 9 U.S.C. § 3).

Under section 2 of the FAA, "state law...governs issues concerning the validity, revocability, and enforceability of contracts generally." *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987). When determining whether a valid arbitration agreement exists, the Court considers both federal policy and applicable state contract law. *2002 Irrevocable Tr. for Hvizdak v. Shenzhen Dev. Bank, Co., Ltd*, No. 208CV556FTM36DNF, 2010 WL 11515171, at *2 (M.D. Fla. Mar. 18, 2010) (citing *Sierra v. Isdell*, 2009 U.S. Dist. LEXIS 66148, *9 (M.D. Fla. 2009)).

As the Eleventh Circuit explained in *Caley*,

> The FAA preempts state law to the extent it treats arbitration agreements differently than other contracts. The purpose of the FAA is to give arbitration agreements the same force and effect as other contracts. However, state law generally governs whether an enforceable contract or agreement to arbitrate exists. Thus, in determining whether a binding agreement arose between the parties, courts apply the contract law of the particular state that governs the formation of contracts.

*Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367–68 (11th Cir. 2005).

In determining whether or not to compel arbitration, a court must consider whether: "(1) *a valid written agreement to arbitrate exists*; (2) an arbitrable issue exists; and (3) the right to arbitrate was waived." *Bentley v. EFN West Palm Motor Sales, LLC*, 214 F.Supp.3d 1299, 1302 (S.D. Fla. 2016) (citing *Sims v. Clarendon Nat'l Ins. Co.*, 336 F.Supp.2d 1311, 1326 (S.D. Fla. 2004)) (emphasis added).

As explained below, no agreement to arbitrate the instant dispute was ever formed. Defendant's Motion relies on the assumption that Plaintiff accessed its website and agreed to the Terms of Service and arbitration agreement. Plaintiff denies this claim and Defendant's Motion should be denied.

### A. Plaintiff denies ever visiting Shine's website—as a result, he could not have agreed to the arbitration clause contained in Shine's Terms of Service.

Shine's argument-in-chief rests on the assumption that a valid arbitration agreement

exists and that Plaintiff's choice to bind himself could "not be more clear." (Def. Mot. at 11.) Plaintiff denies these allegations.

"[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so." *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 559 U.S. 662, 684 (2010). Consequently, "a district court must compel arbitration if the parties have agreed to arbitrate their dispute . . . However, *if the validity of the agreement to arbitrate is in issue, a district court, not a panel of arbitrators, must decide if the arbitration clause is enforceable against the parties.*" *Chastain v. Robinson-Humphrey Co., Inc.*, 957 F.2d 851, 853-54 (11th Cir. 1992) (emphasis added). Furthermore, "[a] party seeking to compel arbitration has the burden to prove the existence of a valid agreement to arbitrate the claims in questions." *In re Walker*, 551 B.R. 679, 683 (M.D. Ga. 2016) (citations omitted).

Unsurprisingly, courts have found arbitration provisions to be unenforceable when no contract exists. *See Ingram Micro Inc. v. Signeo Intern., Ltd.*, No. SACV 13-1934-DOC (ANx), 2014 WL 3721197 *2 (C.D. Cal. July 22, 2014) ("Ingram Micro argues that the Court decides arbitrability and that no written agreement to arbitrate governs Ingram Micro's claims. The Court agrees.")); *see also Altobelli v. Hartmann*, 884 N.W.2d 537, 543 (Mich. 2016) ("[A] party cannot be required to arbitrate an issue which [it] has not agreed to submit to arbitration." (citation omitted))). Likewise, compelling arbitration is inappropriate when a material issue of fact exists as to the validity of a contract. *See Van Tassell v. United Marketing Group, LLC*, 795 F.Supp.2d 770, 787 (N.D. Ill. 2011) (citations omitted) ("[T]he party opposing arbitration must identify a triable issue of fact concerning the existence of the agreement in order to obtain a trial on the merits of the contract.")).

Applied here, Shine cannot carry its burden to demonstrate that an enforceable arbitration

agreement exists. First, Chambers denies ever visiting Shine's website and the IP address that

Shine supplied is not Chamber's IP address. *Cf.* (Chamber's Decl. ¶ 8) *with* (Def. Mot. Ex. A, ¶ 9

(Dkt. 23)). Further, as in *Van Tassell*, the above factual inconsistencies present a "triable issue of

fact concerning the existence of the agreement."

Given that Chambers denies ever visiting the website, a material factual dispute exists

and the Court should deny Shine's Motion. At the very least, the Court should Order a period of

discovery on the issue of Plaintiff's supposed visit to www.shinetext.com and agreement to the

Terms of Service.

**B.      Even if, assuming *arguendo,* Plaintiff did visit Shine's website, the arbitration agreement is unenforceable because Shine's Terms of Service constitute an unenforceable browsewrap agreement.**

Shine next asserts that Chambers visited its website and agreed to its Terms of Service

contained within a click wrap agreement. (Def. Mot. at 11.) This is incorrect. In reality, the

Terms of Service constitutes an unenforceable browsewrap agreement.

"Contracts formed on the Internet come primarily in two flavors: 'clickwrap' (or 'click-

through') agreements, in which website users are required to click on an "I agree" box after

being presented with a list of terms and conditions of use; and "browsewrap" agreements, where

a website's terms and conditions of use are generally posted on the website via a hyperlink at the

bottom of the screen." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014).

"'Browsewrap agreements are those that purport to bind the users of websites' where 'the text of

the agreement is [generally] located on a separate webpage hyperlinked to the website the user is

accessing.'" *Herman v. Seaworld Parks & Entertainment, Inc.*, Case No: 8:14-cv-3028-T-35JSS,

2016 WL 7447555 *4 (M.D. Fla. August 26, 2016) (citing *AvePoint, Inc. v. Power Tools, Inc.*,

981 F. Supp. 2d 496, 510 (W.D. Va. 2013)). Moreover, "[u]nlike 'clickwrap' agreements, where

users are required to click an 'I agree' box after being presented with a list of terms and conditions, browsewrap agreements do not require the user explicitly to assent to the terms and conditions of the agreements expressly." *Id.* (citing *Nguyen*, 763 F.3d at 1176). "The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." *Nguyen*, 763 F.3d at 1176 (citing *Be In, Inc. v. Google Inc.,* No. 12–CV– 03373–LHK, 2013 WL 5568706, at \*6 (N.D. Cal. Oct. 9, 2013)).

In short, "[b]ecause no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Id.* "[W]here, as here, there is no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Id.* at 1177 (citations omitted).

Consider *Friedman v. Guthy-Renker LLC*, in which the court determined that a browsewrap agreement was unenforceable. No. 2:14-cv-06009-ODW(AGRx), 2015 WL 857800 \*5 (C.D. Ca. Feb. 27, 2015). The court reasoned, "the actual checkbox label is problematic. The checkbox is labeled as 'Agree to terms.' By not capitalizing 'terms,' a consumer is not put on notice that the checkbox's 'terms' reference the capitalized 'Terms & Conditions' at the bottom screen." *Id.* Conversely, also in *Friedman*, the court determined that subsequent changes made to the defendant's website rendered the browsewrap agreement enforceable against a second plaintiff. *Id.* at \*6. In upholding the enforceability, the court explained, "the language directly next to the checkbox states 'Agree to Terms and Conditions.' The 'Terms and Conditions'

language is bold, underlined, and hyperlinked. There is now no question that the checkbox is in reference to the proper noun 'Terms and Conditions' that would appear if the user clicked the hyperlink next to the checkbox." *Id.*

Applied here, Shine's Terms of Service constitute an unenforceable browsewrap agreement because it fails to put the average user on notice. As an initial point, Shine does not require users to click a box agreeing to its Terms of Service; instead, the user supposedly accepts by using the website and filling out the submission form. It is entirely possible to fill out the submission form without reviewing or affirmatively agreeing to the Terms of Service.

Next, the Terms of Service are not clear and conspicuous. First, the link to the Terms of Service appears below the submission form in light yellow small print below the large "GET SHINE TEXTS" box, which results in the link blending into the white background making the link difficult to view and going unnoticed. (*See* Shine's Website Homepage, attached hereto as Ex. B (hereafter referred to as "Ex. B").) Next, the terminology contained in the notice is different from the actual opt-in button. That is, the website says in fine print, "*Signing up* means you agree to our Terms of Service." (*Id*) (emphasis added).  However, the opt-in choice does not read "Sign Up"; instead, users are asked to input their name, phone number, and email address into the website and click "GET SHINE TEXTS." Adding to the confusion is the fact that Shine offers a "Sign Up On Messenger" service below the text messaging service offer. (*Id.*) Put another way, nowhere on the webpage does Shine state that by selecting "Get Shine Texts" the user is agreeing to the Terms of Service. In short, the statement "signing up means you agree to our Terms of Service…" would reasonably be interpreted as relating to the "*Sign Up* On Messenger" option, based on its identical wording. Given these issues, it cannot be said that Shine's website places the average user on notice that they are agreeing to the Terms of Service.

Accordingly, the Court should deny Defendant's motion to compel arbitration.

**C.     The arbitration provision in Shine's Terms of Service is unconscionable.**

Again, assuming *arguendo* that Chambers did visit the website, the Court should refuse to enforce the arbitration provision because it is both procedurally and substantively unconscionable.

**1.     The arbitration provision is procedurally unconscionable.**

"[P]rocedural unconscionability involves 'bargaining naughtiness' in the form of unfair surprise, lack of meaningful choice, and an inequality of bargaining power." *In re Checking Account Overdraft Litig.*, No. 09-MD-02036-JLK, 2010 WL 3361127, at *1 (S.D. Fla. Aug. 23, 2010) (citations omitted). The determination of whether or not a contract is procedurally unconscionable "requires [scrutiny] of the contract formation process and the alleged lack of meaningful choice." *NCSPlus Inc. v. WBR Management Corp.*, 949 N.Y.S.2d 317, 323 (N.Y. Sup. Ct. 2012) (citing *Lawrence v. Miller*, 48 A.D.3d 1, 4, 853 N.Y.S.2d 1 [1st Dept. 2007]). In determining whether a lack of meaningful choice exists, "[t]he focus is on such matters as the size and commercial setting of the transaction …, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power." *Id.*

Applied here, Shine's "Terms of Service" are hidden in fine print below the massive "GET SHINE TEXTS" button, which is notably in a black box with bold white lettering. The link to the terms itself is in a light yellow color barely visible on the white background. (Ex. B.) Next, it is worth noting that a user can enter all of their information and sign up for the service before even scrolling down far enough to see the small link to the Terms of Service. And on the off chance that a consumer actually finds the Terms of Service link and clicks on it, the

arbitration provision is buried 4,132 words deep into a 5,229-word agreement.

Additionally, Shine has an entire section in its Terms of Service with a title beginning with "The Legal Stuff . . ." yet nowhere in this section is there even a mention of the arbitration provision. (*See* Shine's Terms of Service ("Terms") ¶ 18, attached hereto as Ex. C.) Instead, the consumer would have to move down further to the next section to view the arbitration provision. (*Id.* ¶ 19.) In other words, a consumer could read all the way to the section supposedly containing legal disclosures and not find the arbitration clause. Finally, unlike "The Legal Stuff" section, the arbitration provision is not in all caps or bolded, instead it blends with the rest of the terms. (*Id.*)

The arbitration clause is also procedurally unconscionable because there was no opportunity for Plaintiff to opt-out. A consumer's ability to opt-out of dispute resolution agreements is a key factor courts consider when determining whether such agreements are procedurally unconscionable. *See Honig v. Comcast of Ga, I. LLC*, 537 F. Supp. 2d 1277, 1289 (N.D. Ga. 2008) ("when a party challenges an arbitration agreement that contains an opt-out provision and fails to opt-out, her unconscionability argument is diluted."); *Blanchard v. MBNA Am. Bank, N.A.*, No. 1:05CV81, 2005 WL 1921000 (W.D.N.C. Aug. 9, 2005) (finding no unconscionability where an arbitration agreement had an opt-out period that the plaintiff did not take advantage of). Here, however, no opportunity to opt-out was made available to Plaintiff. Coupled with its adhesive nature, this shows that the Agreement is procedurally unconscionable.

The arbitration clause is adhesive, it cannot be said that the clause was drafted in a manner to put the ordinary consumer on notice, and there was no mechanism available for opting-out. The arbitration agreement is thus procedurally unconscionable.

### 2.     The arbitration provision is substantively unconscionable.

The substantive unconscionability analysis "entails an examination of the substance of

the agreement in order to determine whether the terms unreasonably favor one party." *Browser v. Gateway 2000, Inc.*, 676 N.Y.S.2d 246, 257 (N.Y. App. Div. 1998). Further, "courts consider whether one or more key terms are unreasonably favorable to one party." *Sablosky v. Edward S. Gordon Co., Inc.*, 535 N.E.2d 643, 647 (N.Y. 1989) (citing *People v. Two Wheel Corp.*, 71 N.Y.2d 693, 699).

In *Brower*, the court specifically found the "loser pays" arrangement to be substantively unconscionable. 676 N.Y.S.2d 569, 574 (N.Y. App. Div. 1998) ("We do find, however, that the excessive cost factor that is necessarily entailed in arbitrating before the ICC is unreasonable and surely serves to deter the individual consumer from invoking the process.") (citation omitted). In holding so, the court reasoned, "[b]arred from resorting to the courts by the arbitration clause in the first instance, the designation of a financially prohibitive forum effectively bars consumers from this forum as well; consumers are thus left with no forum at all in which to resolve a dispute." *Id.*

Here, Shine drafts an arbitration provision that favors Shine in all respects. First, before a consumer even has the right to file an arbitration claim under the provision, the consumer must contact Shine and attempt an informal resolution. If that doesn't resolve the dispute, the consumer may turn to arbitration. However, Shine makes clear that the disputes must be arbitrated in the county of its own headquarters. Given the fact that Shine sends messages all over the country, including Florida, this likely means travel costs for the claimant and his/her attorneys.

Next, both parties are liable for their fees, unless Shine decides, on its own, that a consumer's claim is non-frivolous. (Terms ¶ 19.) Shine's agreement also states that "[t]he award rendered by the arbitrator shall include costs of arbitration, reasonable attorneys' fees and

reasonable costs for expert and other witnesses, and any judgment on the award rendered by the arbitrator may be entered in any court of competent jurisdiction." (*Id.*) Thus, by its plain reading the agreement would require Chambers to pay for Shine's attorneys' fees and expert costs in the event Shine prevails. This sort of loser-pays provision is unconscionable.

As a final point, Shine's agreement lacks any of the incentives present in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011) that made arbitration a more-even playing field in that case. Indeed, although *Concepcion* has generally been cited as giving an unconditional approval to arbitration clauses, the plain text of the decision tells a different story. AT&T's arbitration agreement was objectively favorable to consumers with valid claims, specifying that: (1) for claims of $10,000 or less, the consumer could choose whether to arbitrate in person, by telephone, or based on paper submission; (2) that either party may bring a claim in small claims court instead in lieu of arbitration; (3) AT&T had no ability to seek reimbursement of its attorney's fees; and (4) in the event that a consumer received an arbitration award greater than AT&T's last written settlement offer, AT&T would pay a $7,500 minimum recovery and twice the amount of the consumer's attorney's fees. *Concepcion*, 131 S. Ct. at 1744. Reviewing the provisions at issue, the Court approved of the district court's finding that "the scheme [is] sufficient to provide incentive for the individual prosecution of meritorious claims that are not immediately settled" and the Ninth Circuit's finding that consumers who filed claims would be "essentially guaranteed" to be made whole. *Id.* at 1753. The Court further approved of the district court's finding that the Concepcion's would be better off under the arbitration agreement than they would be participating in a class action. *Id.*

Shine's arbitration agreement is devoid of any of these incentives. In short, unlike *Concepcion*, there are no incentives to actually proceed with arbitration—meaning Shine never

12

answers for its conduct. As such, the Court should refuse to compel arbitration here.

     **D.**    **The Court should allow discovery into arbitration-related issues.**

     At the very least, to the extent there is any question as to the enforceability of the

arbitration agreement the Court should permit discovery. As explained in *Hesse v. Sprint*

*Spectrum, L.P.*:

> The Ninth Circuit Court of Appeals has held that "[t]he FAA provides for discovery and a full trial only if 'the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue.' " *Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716, 726 (9th Cir. 1999) (quoting 9 U.S.C. § 4)). "[T]he making of the arbitration agreement is in issue if the plaintiff alleges that the arbitration clause was fraudulently induced, that one party had overwhelming bargaining power, or that the agreement does not exist." *Hibler v. BCI Coca–Cola Bottling Co. of L.A.,* No. 11–CV–298 JLS (NLS), 2011 WL 4102224, at * 1 (S.D. Cal. Sept.14, 2011) (citing *Granite Rock Co. v. Int'l Broth. of Teamsters,* —— U.S. ——, 130 S.Ct. 2847, 2856, 177 L.Ed.2d 567 (2010); *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 445, 126 S. Ct. 1204, 163 L.Ed.2d 1038 (2006); *Nagrampa v. MailCoups, Inc.,* 469 F.3d 1257, 1269–70 (9th Cir.2006)).
> …
> Numerous courts have required discovery on such issues prior to ruling on a motion to compel arbitration. *See, e.g., Newton v. Clearwire Corp.,* No. 2:11–CV–00783–WMS–DAD, 2011 WL 4458971, at *6–*8 (E.D. Cal. Sept.23, 2011) (permitting limited pre-arbitration discovery regarding unconscionability); *Plows,* 2011 WL 3501872, at *5 (permitting four months to conduct discovery on the enforceability of the arbitration agreement); *Laguna,* 2011 WL 3176469, at *7 (permitting limited discovery, narrowly tailored to determining whether arbitration clause is enforceable under state law); *Hamby v. Power Toyota Irvine,* 798 F.Supp.2d 1163, 1164–65 (S.D.Cal.2011) (permitting limited pre-arbitration discovery on issue of unconscionability); *Larsen v. J.P. Morgan Chase Bank, N.A.,* Nos. 10–12936, 10–12937, 2011 WL 3794755, at *1 (11th Cir. Aug.26, 2011) (vacating district court order which denied a motion to stay pending arbitration and remanding with instructions to reconsider in light of the Supreme Court's decision in *Concepcion* and that "discovery is to be limited to issues bearing significantly on the arbitrability of this dispute until the question of arbitrability has been decided.").

No. C06-0592JLR, 2012 WL 37399, at *2 (W.D. Wash. Jan. 9, 2012).

     Discovery is needed regarding the enforceability of the arbitration agreement here,

namely as to whether it was agreed to in the first place. As such, if the Court is not inclined to

deny the Motion to Compel Arbitration outright, at the very least the Court should allow

discovery with respect to issues affecting the enforceability of the arbitration provision.

**E.      Plaintiff's injuries occurred in the State of Florida and Shine's conduct challenged in this lawsuit was directed to Florida—accordingly, no compelling basis exists to transfer the venue.**

Switching gears, Shine attempts to invoke a forum selection clause contained in the Terms of Service. (Def. Mot. at 15 - 20.) "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C.A. § 1404 (2011).

As with the arbitration agreement Shine seeks to enforce, Chambers never visited Shine's website and thus no basis exists for enforcing the forum selection clause. For the reasons set forth below, no compelling justification exists to grant this motion.

**1.      Plaintiff has not visited Shine's website and thus no enforceable forum selection clause exists.**

Shine, again, attempts to invoke its terms of service by claiming that Chambers agreed to the forum selection clause. (Def. Mot. at 17.) As explained above, Chambers denies this allegation.

In determining whether a venue transfer is appropriate the Supreme Court has explained, "when a plaintiff *agrees by contract* to bring suit only in a specified forum—presumably in exchange for other binding promises by the defendant—the plaintiff has effectively exercised its 'venue privilege' before a dispute arises." *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for Western Dist. of Texas*, 134 S.Ct. 568, 581 (2013) (emphasis added). Accordingly, a forum selection clause is unenforceable if no contract exists. *See Traton news, LLC v. Traton Corp.*, 914 F.Supp.2d 901, 909 (S.D. Ohio 2012) ("[T]he Court finds that Traton Homes is not bound by the forum selection clause because *no contract was formed* between Plaintiff and Defendants.") (emphasis added).

Consider, *Zaltz v. JDate*, in which the court found a forum selection clause enforceable. 952 F.Supp.2d 439, 448 (E.D.N.Y. 2013). In *Zaltz*, the court seized on the fact that the "plaintiff does not dispute the process described by [Defendant]" and, further, "[p]laintiff does not even dispute having read or agreed to certain terms of service before signing up for the website or renewing her membership." *Id.* at 451. The court concluded, "[b]ecause plaintiff has alleged no facts that would provide grounds to invalidate that forum selection clause, discovery and/or an evidentiary hearing on this issue is unnecessary." *Id.* at 448.

Unlike *Zaltz*, Plaintiff has offered evidence that contradicts Shine's claims. Most notably, the IP address that Shine claims Chambers used doesn't match his private IP address. (Chambers Decl. ¶ 8.) Additionally, Chambers has filed a declaration that details the factual dispute.  Also unlike *Zaltz*, Plaintiff does not merely allege that he doesn't remember agreeing to the terms; instead, Plaintiff contends that he never visited the website at all.

The Court should deny Defendant's request to transfer on this basis.

**2.    Again, even assuming *arguendo* Plaintiff did visit Shine's website, the forum selection clause is part of an unenforceable browser-wrap agreement.**

Defendant claims that its forum selection clause is valid and enforceable. (Def. Mot. at 16.) This is incorrect.

As explained in further detail above, "the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Herman v. Seaworld Parks & Entertainment, Inc.*, Case No: 8:14-cv-3028-T-35JSS, 2016 WL 7447555 *4 (M.D. Fla. August 26, 2016). In regards to a forum selection clause, "the forum selection clause cannot be 'proffered unfairly, or with a design to conceal or de-emphasize its provisions.'" *Hoffman v. Supplements Togo Management, LLC*, 419 N.J.Super.

596, 611 (N.J. Super. Ct. App. Div. 2011).

Courts have repeatedly held forum selection clauses to be unenforceable when they are included in browsewrap agreements that fail to give consumers reasonable notice. *See Id.* at 612 ("We therefore hold that the forum selection clause in this case was presumptively unenforceable."); *see also Sundicate 1245 at Lloyd's v. Walnut Advisory Corp.*, No. 09-1697, 2011 WL 5825979 *6 (D.N.J. Nov. 16, 2011) ("Ultimately, the Court finds that Walnut did not receive sufficient notice of the TOBAs. Since Walnut did not receive sufficient notice of the TOBAs, the forum selection clauses included in the TOBAs are not part of Walnut and Miller's implied contract."); *see also Live Face on Web, LLC v. Complete Family Dentistry, P.C.*, CIVIL ACTION No. 16-7, 2016 WL 8813993 *3 (W.D. Pa. Nov. 18, 2016) ("There is no evidence Complete had reasonable notice of or assented to the forum selection clause in the Terms of Use on Solution's website.").

Since Shine's forum selection clause is hidden in its Terms of Service—just as its arbitration provision is—it cannot be reasonably said that Plaintiff agreed to it or was placed on notice of its existence. To reiterate, Shine's "Terms of Service" are placed in fine print in a yellow font on its website. The combination of the fine print and yellow font render it difficult to even view the Terms. Furthermore, even if a consumer does see the hyperlink, Shine only claims that "Signing up means you agree." Yet, the opt-in button reads "GET SHINE TEXTS," not "Sign Up". To make matters more confusing Shine has another option to "Sign Up on Messenger." Even if the user were to make it to the "Terms of Service" page, they still would have to read 4,549 words into the 5,229 word agreement to reach the forum selection clause. Additionally, just like the arbitration provision, the forum selection clause is not included in the paragraph entitled "The Legal Stuff" and it is not set-off, bolded, or even highlighted in any way.

The confusing nature of the layout and the buried forum selection clause ultimately fail to give the average user reasonable notice of the clause and, in turn, constitutes an unenforceable agreement.

Accordingly, the Court should deny Defendant's motion to transfer this case to the Eastern District of New York on this basis.

> **F.     Given that Shine directs its text messages to Florida and a substantial portion of the evidence exists in Florida, there is no major inconvenience associated with requiring Shine to litigate in Florida.**

For its final argument, Shine contends that the Court should transfer the case to the Eastern District of New York based upon the doctrine of forum non conveniens. (Def. Mot. 21-22.) This argument misses the mark.

In analyzing the requirements of forum non conveniens "the movant must show that '(1) an adequate alternative forum is available, (2) the public and private factors weigh in favor of dismissal, and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice.'" *TNT USA, Inc. v. TrafiExpress, S.A. de C.V.*, 434 F.Supp.2d 1322, 1332 (S.D. Fla. 2006) (citing *Leon v. Million Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir. 2001). Furthermore, "[i]n a forum non conveniens inquiry, courts show deference to a plaintiff's choice of forum." *Id.* However, the "Supreme Court precedent commands that a citizen plaintiff's choice of forum is entitled to even greater deference when the *plaintiff chooses her 'home forum.'*" *DiFederico v. Marriott Intern., Inc.*, 714 F.3d 796, 802-03 (4th Cir. 2013) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981)) (emphasis added). Ultimately, when balancing the interests, "[d]ismissal is usually not appropriate unless 'the balance of convenience tilts strongly in favor of trial in the foreign forum.'" *In re European Aeronautic Defence & Space Co. Securities Litigation*, 703 F.Supp.2d 348, 359 (S.D.N.Y. 2010) (citing *R. Maganlal & Co. v.*

*M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir. 1991)).

The reality is, while Shine may prefer to litigate in New York, it will not be prejudiced by litigating in Florida. First, a substantial portion of the events and evidence exist in in Florida. That is, Shine directed text messages throughout the United States and as a result injured a consumer, Chambers, in the state of Florida. Chambers himself resides in Florida and his cellular telephone service is based in Florida. Furthermore, the computer and internet service provider that Shine claims was used to access its services are located in Florida. In short, nothing about the Middle District of Florida forum presents any burden for adjudicating the matter. The Plaintiff is entitled to deference in his forum selection—especially his home forum—and thus this case should not be transferred.

Accordingly, the Court should reject Shine's last attempt to transfer the case.

## IV.    CONCLUSION

The Court should deny Defendant's Motion to Dismiss and to Compel Arbitration or, in the Alternative, to Transfer Venue. Shine simply cannot demonstrate that Chambers agreed to its Terms of Service. As a result, the Court should deny Defendant's Motion and award such additional relief as it deems necessary and just.

Dated: November 17, 2017                     Respectfully submitted,

**ANDREW CHAMBERS**, individually and on behalf of all others similarly situated,

/s/ Patrick H. Peluso

One of Plaintiff's Attorneys

Steven L. Woodrow*
swoodrow@woodrowpeluso.com
Patrick H. Peluso*
ppeluso@woodrowpeluso.com

18

Woodrow & Peluso, LLC
3900 E. Mexico Ave., Suite 300
Denver, Colorado 80210
720.213.0675

Ryan S. Shipp
ryan@shipplawoffice.com
Law Office of Ryan S. Shipp, PLLC
814 W. Lantana Road, Suite 1
Lantana, Florida 33462
561.699.0399

**\*pro hac vice**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 17, 2017, the foregoing document was served upon all counsel of record by filing such papers with the Court using the Court's ECF electronic filing system.

/s/ Patrick H. Peluso
Patrick H. Peluso